1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6

7   KEVIN MCFALL,                          Case No.  14-cv-04150-JSC
              Plaintiff,
8
         v.                                **ORDER GRANTING IN PART AND
9                                          DENYING IN PART MOTION TO
    STACY AND WITBECK, INC., et al.,       DISMISS**
10
              Defendants.                  Re: Dkt. No. 12
11

12

13        This lawsuit arises out of Plaintiff's sale of his stock in Defendant Stacy and Witbeck, Inc.,

14   a closely held corporation.  Now pending before the Court is the motion of Defendants Stacy and

15   Witbeck, Inc. and John Bollier, a Stacy and Witbeck officer and shareholder, (collectively,

16   Defendants) to dismiss for failure to state a claim upon which relief may be granted.  (Dkt. No.

17   12.)  After carefully considering the papers submitted by the parties, and having had the benefit of

18   oral argument on December 4, 2014, the Court GRANTS the motion to dismiss as to Plaintiff's

19   claims which are premised on his assertion that his shares should have been valued based upon the

20   Fiscal Year 2013 appraised value.  The plain language of the Buy-Sell Agreement does not

21   support Plaintiff's contract interpretation as a matter of law.  In all other respects Defendants'

22   motion to dismiss is DENIED.  Because Plaintiff's claims do not depend upon the existence of an

23   ERISA plan nor require interpretation of an ERISA plan they are not preempted by ERISA.

24   Further, the language of the Buy Sell Agreement and controlling California caselaw defeat

25   Defendant Bollier's assertion that he cannot be found liable to Plaintiff.[1]

26

27

28   ─────────────────────
     [1] The parties have consented to the jurisdiction of this Magistrate Judge. (Dkt. Nos. 14, 15.)

**FACTUAL & PROCEDURAL BACKGROUND**

This lawsuit arises out of a stock repurchase agreement ("Buy-Sell Agreement") entered into by Plaintiff Kevin McFall and his ex-employer, Defendant Stacy and Witbeck, Inc. (the "Company"). The Company is a San Francisco-based civil contractor. (Dkt. No. 1 (Complaint) ¶ 6.) Plaintiff was employed by the Company as a project manager from 1999 until his retirement in 2013. (*Id.* at ¶¶ 7-8.) Defendant John Bollier was an officer of the Company during Plaintiff's employment. (*Id.* at ¶ 16.)

During the course of his career, Plaintiff purchased or was awarded shares of Company stock pursuant to three different agreements with the Company. He purchased 26,300 shares between 2004 and 2013. (*Id.* at ¶ 10.) The sale or transfer of those shares by Plaintiff was governed by the first agreement—the 2006 Buy-Sell Agreement. (Dkt. No. 1 ¶ 11.) The second was an agreement giving Plaintiff the option to buy 2000 shares per year in 2007 and 2008 or receive the cash equivalent of these shares at the end of a five-year vesting period (2012 and 2013, respectively). (*Id.* ¶ 10.) The third agreement was a 1998 Employee Stock Ownership Plan (the "ESOP Plan") whereby Plaintiff was awarded 6,335 additional shares of Company stock. (*Id.* ¶ 10.)

**A.      The Buy-Sell Agreement**

The Buy-Sell Agreement recites its general purpose as follows:

> The Stockholders wish to provide a market for their shares of Stock on their deaths. The Stockholders wish to restrict ownership of the Stock to the present Stockholders and to persons . . . who are actively employed by the Company. . . . The Stockholders and the Company, to accomplish these objectives, wish to arrange for certain restrictions on the Transfer of the Stockholders' shares of the Stock to persons other than the parties to this Agreement.

(Dkt. No. 12-2 § D-G.)[2] To accomplish its goal of restricting ownership to only those employed by the Company, the Agreement states that no Stockholder may "Encumber, Transfer, or permit to

---

[2] Although the Complaint represents that a copy of the Buy-Sell Agreement is attached to the Complaint as Exhibit A (Dkt. No. 1 ¶ 11), no exhibits are attached to the Complaint. Defendants have attached a copy of the Agreement to their motion to dismiss. (Dkt. No. 12-2.) Because the Complaint refers to the Agreement the Court may consider it on a Rule 12(b)(6) motion to dismiss. *See Knieval v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

United States District Court
Northern District of California

be Encumbered or Transferred all or any portion of his shares of the Stock, except in accordance with the Terms of [the] Agreement." (*Id.* ¶ 1.2.)  The Agreement then identifies several scenarios in which shares may be transferred, including the termination of a Stockholder's employment.  (*Id.* ¶ 1.3).  In the case of a Stockholder's separation from the Company, the Stockholder is "deemed" to have offered to sell his or her shares to the Company "on the date on which the Stockholder ceased to be an employee ('Offer Date')." (*Id.*)   The Agreement provides further that the sales price is the "Agreed Purchase Price."  (*Id.*).  The "Agreed Purchase Price," in turn, is defined as follows:

> (a) Valuation.  The "Agreed Purchase Price" of the Stock shall be the per share price determined by appraisal in accordance with the provisions of Paragraph 6.2 of the Plan.  The appraisal that was performed most recently prior to the Offer Date shall be the appraisal utilized, provided that if the Offer Date is after November 30 but before the appraisal for that year has been completed, the appraisal from the prior November 30 shall be utilized to temporarily determine the Agreed Purchase Price, and the Closing shall occur based on 80 percent of such prior appraisal.  Within 30 days after completion of the current appraisal, the Company shall recalculate the Agreed Purchase Price, and the parties shall make any necessary adjustments as to that portion of the Agreed Purchase Price paid in cash and that portion paid by note.

(Dkt. No. 12-2 ¶ 2.2.)  The "Plan" referred to is the Stacy and Witbeck, Inc. Profit Sharing Plan dated July 29, 1998 (the ESOP Plan). (Dkt. No. 12-2 ¶ B.)  Thus, the Buy-Sell Agreement provides that the shares of the departing employee will be valued based on an appraisal in accordance with Paragraph 6.2 of the 1998 ESOP Plan.

Paragraph 6.2 of the Plan explains the valuation method as follows, in relevant part:

> Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities . . . .  [A] determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to the transaction will be deemed to be a good faith determination of value.  Company stock not readily tradeable on an established securities market shall be valued by an independent appraiser meting requirements similar to the requirements of the Regulations prescribed under Code Section 170(a)(1).

(Dkt. No. 12-3 ¶ 6.2.)[3]

---

[3] The Court may consider the ESOP Plan on Defendants' motion to dismiss for the same reasons it

1       "Since the inception of the Buy-Sell, [the Company] employed the accounting firm of

2  Houlihan Lokey to perform the [independent] appraisal on which all stockholders relied in

3  analyzing the value of their shares and, in some instances, selling those shares."  (Complaint ¶ 14.)

4  After the Company's November 30 fiscal year end, "[t]he appraisal for any given fiscal year was

5  completed in February of the following calendar year."  (*Id*. ¶¶13, 14.)  "Between 2007 and 2011,

6  the yearly stock valuation soared from $66.65 per share to $251.70 per share, a 377% increase and

7  an average yearly increase of 53% per year."  (*Id*. ¶15.)

8       Payment and transfer of Company stock upon retirement or other triggering event is

9  governed by Paragraph 2.2(b) of the Buy-Sell Agreement.  Paragraph 2.2(b)(2) states that if an

10  employee's Agreed Purchase Price is more than $25,000, the Company will pay the employee: "(i)

11  $25,000 plus Ten percent (10%) of the Agreed Purchase Price . . . in cash and (ii) the balance . . .

12  pursuant to a promissory note . . . ."  (Dkt. No. 12-2 ¶ 2.2(b)(2).)  The Buy-Sell Agreement

13  further mandates that the deferred portion paid to the employee "shall be a five-year note payable

14  in ten (10) equal semi-annual installments of principal and interest . . . ."  (*Id*. ¶2.5(a)-(b).)

15  **B.**    **The Sale of Plaintiff's Shares**

16       In March 2012, Plaintiff announced that he would be retiring from the Company in June

17  2013.  (Dkt. No. 1 ¶ 20.)  When his first 2000 share options vested in June 2012, Plaintiff opted to

18  receive cash in lieu of those shares, "a decision he would also make for the June 2013 vesting."

19  (*Id.*)  Plaintiff then sold his 26,300 privately held shares "in December 2012, the first month of

20  fiscal year 2013 . . . ."  (*Id.*)  For the 2000 option shares Plaintiff sold in 2012, he received the per

21  share value calculated for the fiscal year 2011.  For the 2000 option shares and 26,300 privately

22  held shares Plaintiff sold during fiscal year 2013, Plaintiff received the per share value calculated

23  for the fiscal year 2012.  (*Id.* ¶¶ 21-22.)

24  **C.**    **Plaintiff's Complaint**

25       Plaintiff first contends that the Company used the wrong valuation year to purchase his

26  shares.  (*Id.* at ¶ 21.)  He claims that the Buy-Sell Agreement "provided that [he] should have

27

28

United States District Court
Northern District of California

can consider the Buy-Sell Agreement.  *See infra,* fn. 2.

4

received a cash payment based on the valuation immediately preceding the fiscal year of retirement and then receive an adjustment after the applicable fiscal year valuation was finalized." (*Id*.) Thus, Plaintiff's first claim is that the Company breached the express terms of the Buy-Sell Agreement by purchasing his shares at prior year valuations and not at the per share price of the fiscal year when he sold them.

Plaintiff next contends that, even if the correct fiscal year valuations were used, the valuations he received for his shares were wrongfully depressed by the Company's agent, Defendant Bollier. (*Id*. at ¶¶ 16-19, 22-26.) In 2010, Bollier began instructing the third-party appraiser Houlihan Lokey to "value the company without taking into account excess cash on hand, a major variation from generally accepted accounting and valuation principles which has the effect of depressing stock value." (*Id*. at ¶ 16.) "After significant wrangling, Bollier relented and allowed excess cash to be calculated into the fiscal year 2010 appraisal." (*Id*.) In fiscal year 2011, Bollier "again sought to drive down the company stock price by refusing to count [the Company's] excess cash – now at record levels – as part of the company's valuation." (*Id*. at ¶ 18.) The Board of Directors protested this methodology and "Bollier eventually agreed to an adjustment, but in a tightly controlled process, instructed Houlihan Lokey to include some, but not all excess cash, to drive up the valuation slightly." (*Id*. at ¶ 19.) The resulting valuation at $275.16 per share for fiscal year 2011 was "still set well below its true value. . . ." (*Id*.)

In fiscal year 2012, "Bollier initially announced a significant stock price reduction to $248 per share." (*Id*. at ¶ 22.) Bollier used "arbitrary and extraordinarily conservative growth rates to drive down the stock price further . . . [and] again attempted to justify the reduction by claiming that cash on hand should be ignored as part of the valuation because the company needed to save money to buy out current shareholders in future years." (*Id*.) "In a follow up meeting with Houlihan Lokey . . . the accountants confirmed that cash needed for future buyouts was not an appropriate factor to use in driving down share price and that the estimated future growth numbers were inappropriately conservative based on past performance." (*Id*. at ¶ 23.) As a result of this meeting, Bollier announced an upward revision of the share price to $279.24. (*Id*. at ¶ 24.) "Unlike in prior years, Bollier refused to provide the board with a copy of the actual valuation or

United States District Court
Northern District of California

5

1   put it up to a vote." (*Id.*)  After the 2013 fiscal year appraisal, "when Bollier liquidated most or all

2   of his holdings, on information and belief, the share price was set at $340 per share, an increase of

3   22%.  On information and belief, profits had remained constant and there was no legitimate basis

4   to use a different valuation methodology than in [2012]." (*Id.* at ¶ 25.)

5        In what Plaintiff characterizes as the First Claim for Relief, Count I, Plaintiff alleges that

6   the Company breached the Buy-Sell Agreement regarding "the appropriate valuation stock price,"

7   by making misrepresentations about the "overall state of the company for the purpose of

8   preventing [Plaintiff] from recovering full value for his shares, manipulating the stock price and

9   hoarding excess cash." (Dkt. No. 1 ¶¶ 27-30.)  Counts II and III of the First Claim for relief

10  allege that the Company and defendant Bollier breached the duty of good faith and fair dealing set

11  forth in ¶ 5.4 of the Buy-Sell Agreement based on the above conduct.  The Second Claim for

12  Relief alleges that defendant Bollier, as an officer/director and stockholder, breached his fiduciary

13  duty. (*Id.* ¶¶  39-41.)   Defendants now move to dismiss the entire suit.  (Dkt. No. 12.)

14                                          **LEGAL STANDARD**

15        Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for

16  failure to state a claim upon which relief may be granted based on either the lack of a cognizable

17  legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  *See*

18  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  When evaluating a motion

19  to dismiss, the court "must presume all factual allegations of the Complaint to be true and draw all

20  reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d

21  556, 561 (9th Cir. 1987).  However, "[t]hreadbare recitals of the elements of a cause of action,

22  supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

23  129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  The complaint must plead "enough facts to state a claim

24  for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct.

25  1955, 167 L.Ed.2d 929 (2007).  A claim is plausible on its face "when the plaintiff pleads factual

26  content that allows the court to draw the reasonable inference that the defendant is liable for the

27  misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

28  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

1   unlawfully." *Id.* Courts may dismiss a case without leave to amend only if the plaintiff is unable
2   to cure the defect by amendment. *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir.2000).

3        Because the Court here is sitting in diversity it applies California substantive law.
4   *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659
5   (1996) ("[F]ederal courts sitting in diversity jurisdiction apply state substantive law and federal
6   procedural law.").

7   **DISCUSSION**

8   **A.**    **Plaintiff's Breach of Contract Theories**

9        The elements of a breach of contract claim under California law are: (1) the contract, (2)
10  the plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the
11  resulting damages to plaintiff. *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 830 (1968). Here,
12  the Buy-Sell Agreement is the alleged contract, and Plaintiff's relinquishment of his shares to the
13  Company represents his performance of the contract. Assuming Plaintiff has properly alleged
14  Defendants' breach, he has also properly alleged resulting damages from receiving a lower value
15  for his shares of Company stock. The issue, then, is whether Plaintiff has properly alleged
16  Defendants' breach of the Buy-Sell Agreement.

17       Plaintiff asserts two theories for breach of contract. First, that the Company breached the
18  express terms of the Buy-Sell Agreement, specifically, paragraphs 2.2 and 5.4, when it purchased
19  his shares of Company stock at FY 2011 (June 2012 sale) and FY 2012 (December 2012 and May
20  2013 sales) year valuations. The second theory is that, even assuming the Company utilized the
21  correct appraisal year to compute his sale price, Bollier's alleged self-dealing and manipulation of
22  the appraisals also breached the same provisions of the Buy-Sell Agreement.

23       As an initial matter, the Court notes that the Buy-Sell Agreement does not contemplate
24  what is alleged to have occurred here; namely, an employee (Plaintiff) sold his shares *while he*
25  *was still employed* with the Company (June 2011, December 2012 and May 2013). At oral
26  argument, however, the parties agreed that the Buy-Sell Agreement nonetheless still applies and,
27  in particular, that the shares were to be valued in accordance with paragraph 2.2. The difficulty
28  with this approach is that the valuation of the shares is tied to the "Offer Date" and the Buy-Sell

United States District Court
Northern District of California

Agreement does not define an "Offer Date" for shares sold during employment.  Thus, for purposes of Defendants' motion to dismiss, the Court will apply the only "Offer Date" set forth in the Buy-Sell Agreement that is possibly applicable, the date of an employee's separation from the company: June 2013.  There is no dispute that such date is the latest possible Offer Date and the date most favorable to Plaintiff.

### 1. Valuation Year

Plaintiff argues that pursuant to Paragraph 2.2(a) of the Buy-Sell Agreement all of his shares should have been valued based on the FY 2013 appraisal, that is, the appraisal that was completed in February 2014.  The Court disagrees.

"Under California law, the interpretation of a contract is a question of law[.]"  *In re Bennett,* 298 F.3d 1059, 1064 (9th Cir. 2002) (citation omitted).  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  Cal. Code Civ. P. § 1638.  A contract must be construed "by reading it as a whole and interpreting each part with reference to the entire contract."  *Tanadgusix Corp.* v. Huber, 404 F.3d 1201, 1205 (9th Cir. 2005); *see also Winet v. Price,* 4 Cal.App.4th 1159, 1166, 6 Cal.Rptr.2d 554 (1992) ("It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce").

Paragraph 2.2(a) is not ambiguous, and Defendants' interpretation is not absurd.  Paragraph 2.2(a) states that a departing employee stockholder will receive as his "Agreed Purchase Price" the appraisal value "that was performed most recently prior to the Offer Date."  (Dkt. No. 12-2 ¶2.2(a).)  As set forth above, the Offer Date is June 2013, the day Plaintiff retired from the Company.   According to the Complaint, the appraisal that was performed most recently prior to the Offer Date would have been completed in February 2013; thus, that appraisal, which is for the fiscal year ending November 2012, governs under the plain terms of the Agreement.

Plaintiff does not dispute that the above construction is reasonable; instead, he posits another construction which he contends is also plausible and therefore defeats the motion to dismiss.  Paragraph 2.2(a) goes on to state:

if the Offer Date is after November 30 but before the appraisal for

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

> that year has been completed, the appraisal from the prior November
> 30 shall be utilized to temporarily determine the Agreed Purchase
> Price, and the Closing shall occur based on 80 percent of such prior
> appraisal. Within 30 days after completion of the current appraisal,
> the Company shall re-calculate the Agreed Purchase Price, and the
> parties shall make any necessary adjustments as to that portion of
> the Agreed Purchase Price paid in cash and that portion paid in note.

(*Id*. (emphasis added).)  Plaintiff argues that "that year" refers to the fiscal year of the Offer Date. Thus, here, since the Offer Date is June 2013, and the appraisal for FY 2013 was not yet available (because the fiscal year had not closed), according to Plaintiff the Company was required to temporarily compensate Plaintiff based upon the FY 2012 appraisal (completed in February 2013), and then "true up" upon the completion of the FY 2013 appraisal in February 2014.  Actually, for the shares sold in December 2012, under Plaintiff's theory Defendants were required to pay Plaintiff 80 percent based on the FY 2011 appraisal (completed in February 2012) and then "true up" when the FY 2013 appraisal was completed in February 2014—the appraisal in between (FY 2012) is ignored.

Plaintiff's interpretation ignores the plain language of the provision.  If "that year" refers to the fiscal year of the Offer Date, then the appraisal will never be available as of the Offer Date because the appraisal cannot be completed until the fiscal year is complete.  Thus, Plaintiff's construction renders the "if the Offer Date is after November 30 but before the appraisal for that year has been completed" wholly unnecessary: the appraisal will have never been completed by the Offer Date.  Moreover, a reading of the paragraph as a whole conclusively demonstrates that "that year" refers to the preceding year discussed, that is, the year ending "November 30," the fiscal year preceding the Offer Date.  Plaintiff's interpretation is not plausible as a matter of law.

Under the plain language of paragraph 2.2(a), the appropriate appraisal to be utilized for shares with an Offer Date of June 2013 is "that which was performed most recently prior to the Offer Date," that is, the FY 2012 appraisal performed in or around February 2013.  Because Plaintiff admits that the Company repurchased his shares sold in December 2012 and June 2013 based on the FY 2012 appraisal, his breach of contract and breach of the duty of good faith and fair dealing claims fails as a matter of law to the extent they are based on the contention that the FY 2013 appraisal should have been utilized.  Thus, the claim must be dismissed.  The dismissal is

1    with leave to amend to allege that the June 2012 option sale should have been valued with the FY

2    2012 appraised value rather than the FY 2011 value; as explained above, Defendants have not

3    established as a matter of law that the Offer Date for the June 2012 transaction is June 2012 rather

4    than June 2013 under the Agreement.

5         **2.      Improper Valuation**

6         Plaintiff's second contractual theory is that Defendants improperly manipulated and

7    depressed the appraisal value for FY 2012.  He alleges that this conduct violated the express duty

8    of good faith and fair dealing set forth in paragraph 5.4 of the Agreement, as well as other

9    unspecified provisions of the Agreement.  Although not explicitly identified, all parties appear to

10   agree that Plaintiff is alleging that Defendant violated paragraph 2.2(a)'s command that the

11   "Agreed Purchase Price" be determined by an appraisal "in accordance with the provisions of

12   Paragraph 6.2" of the 1998 ESOP Plan.  Recall that Paragraph 6.2 requires a determination of fair

13   market value based on an independent appraisal.  Plaintiff's theory is, in effect, that the FY 2012

14   appraisal value was not independently arrived at because of Defendants' manipulation.

15        Defendants insist that because the Buy-Sell Agreement refers to Paragraph 6.2 of the

16   ESOP Plan, and the ESOP Plan is an ERISA Plan, Defendants' claims are preempted by ERISA

17   and must be dismissed.   Since ERISA preemption is a federal defense, Defendants bear the

18   burden of proving the facts necessary to establish preemption.  *Kanne v. Connecticut Gen. Live

19   Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988).  Defendants have not done so.

20        "ERISA is a comprehensive statute designed to promote the interests of employees and

21   their beneficiaries in employee benefit plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90

22   (1983) (internal citations and quotation marks omitted).  The term "employee benefit plan" is

23   defined as any program that provides income deferral or retirement income.  *Id.* at 91 n.5 (citing

24   29 U.S.C. § 1002(2)).  "The statute imposes participation, funding, and vesting requirements on

25   pension plans. . . . [and] also sets various uniform standards, including rules concerning reporting,

26   disclosure, and fiduciary responsibility, for both pension and welfare plans.  *Id.*

27        "As part of this closely integrated regulatory system Congress included various safeguards

28   to preclude abuse and to completely secure the rights and expectations brought into being by this

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1   landmark reform legislation." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990)

2   (internal citations and quotation marks omitted).  Among these safeguards is ERISA's broad

3   conflict preemption doctrine which "pre-empts any and all State laws insofar as they may now or

4   hereafter relate to any employee benefit plan covered by ERISA."  *Shaw*, 463 U.S. at 91.

5           In *Ingersoll*, the United States Supreme Court stated that "[t]he question whether a certain

6   state action is pre-empted by federal law is one of congressional intent. . . . To discern Congress'

7   intent we examine the explicit statutory language and the structure and purpose of the statute."

8   498 U.S. at 137-138.  Preemption is to be expansively applied to preempt state "laws, decisions,

9   rules, regulations, or other State action having the effect of law."  *Id.*  "A law 'relates to' an

10   employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to

11   such a plan."  *Id.*

12           Courts have routinely held that stock purchase agreements of closely held corporations and

13   other similar employer-sponsored stock option plans are not preempted by ERISA.  *See Murphy v.*

14   *Inexco Oil Co*., 611 F.2d 570, 575 (5th Cir. 1980) (holding that "any outright conveyance of

15   property to an employee might result in some payment to him after retirement," but that a stock

16   bonus plan was nevertheless not covered by ERISA because its central purpose was not retirement

17   security); *see also Foltz v. U.S. News & World Report*, 627 F. Supp. 1143, (D.C. Cir. 1986)

18   (holding that a stock bonus plan granting certain employees common stock which could not be

19   sold without company approval and which employee was required to sell back to company upon

20   retirement or termination was not an "employee pension plan" within meaning of ERISA);

21   *Oatway v. American Intern. Group, Inc*., 325 F.3d 184, 187-189 (3rd Cir. 2003) (same); *Roderick*

22   *v. Mazzetti & Associates, Inc*., 2004 WL 2554453, *6-10 (N.D. Cal. Nov. 9, 2004) (stock purchase

23   agreement of closely held corporation not preempted by ERISA);  *Rich v. Shrader*, 2011 WL

24   4434852, *7 (S.D. Cal. Sept. 22, 2011) (looking at "totality of the surrounding circumstances from

25   the point of view of a reasonable person," employee stock option plan whereby key employees

26   were awarded company shares as an incentive and were only allowed to sell shares back to the

27   company was not preempted by ERISA).

28           Defendants do not dispute that the Buy-Sell Agreement itself is not an ERISA plan;

1   instead, they contend that any claims for breach of the Buy-Sell Agreement are preempted by

2   ERISA because the claims "depend[ ] on the existence of an ERISA plan." (Dkt. No. 19 at 9.)  In

3   particular, Defendants argue that through paragraph 2.2 of the Buy-Sell Agreement, the parties

4   agreed that the sales price of Plaintiff's stock "would be priced according to a valuation

5   conduct[ed] *by the ESOP trustee.*"  (*Id.* at 14.)  The Court is not persuaded.

6        First, the Buy-Sell Agreement does not refer to a valuation conducted by the ESOP trustee;

7   instead, it recites the existence of the 1998 ESOP Plan (Dkt. No. 12-2 ¶ B), and provides that the

8   "per share price [shall be] determined by appraisal in accordance with the provisions of Paragraph

9   6.2 of the [1998] Plan."  (*Id.* at ¶ 2.2(a)).  Paragraph 6.2 of the 1998 Plan, in turn, requires an

10   annual appraisal "independently arrived at by a person who customarily makes such appraisals and

11   who is independent of any party to the transaction." (Dkt. No. 12-3 ¶ 6.2.)  The Paragraph says

12   nothing about an evaluation conducted by an ESOP trustee.  Paragraph 6.1 of the 1998 ESOP Plan

13   directs the ESOP Trustee to annually determine the fair market value of Plan assets, but this

14   paragraph is not in any way incorporated into the Buy-Sell Agreement.

15        Second, the Buy-Sell Agreement does not depend on the existence of an ERISA plan.  The

16   Agreement's valuation method incorporates the valuation method set forth in the 1998 Plan, but

17   according to Defendants the 1998 ESOP Plan has been superseded.  (Dkt. No. 12-4.)  The plan

18   which Defendants contend was in existence at the time of the valuation of Plaintiff's shares does

19   not contain a paragraph 6.2, and there is nothing in the Buy-Sell Agreement that prospectively

20   adopts future versions of the 1998 ESOP Plan.  Thus, the Buy-Sell Agreement does not relate to

21   any ERISA plan currently in existence, even assuming Defendants are correct that merely

22   adopting the valuation method set forth in an ERISA plan requires preemption.

23        The cases Defendants cite are distinguishable.  In *Ingersoll*, the plaintiff sued the defendant

24   under a state law which prohibited the discharge of an employee to avoid marking payments to the

25   employee's pension fund.  498 U.S. 133.  The Supreme Court held the state law "relates to" an

26   ERISA plan, and was therefore preempted, because the state cause of action is premised on the

27   existence of a pension plan: without a pension plan (which is an ERISA plan) there could be no

28   claim that the employee was terminated to avoid making payments to that pension plan.  *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

1  140.[4]  Here, as explained above, the ERISA plan at issue—the 1998 ESOP Plan—need not exist;

2  indeed, Defendants contend that it is no longer in effect.  And even if it was still in effect,

3  Plaintiff's claim does not depend on the ESOP Plan; instead, it depends on the valuation method

4  set forth in the Plan.   Unsurprisingly, Defendants do not cite *any* case which finds ERISA

5  preemption merely because the non-ERISA plan utilizes a valuation method, or any definition, set

6  forth in an ERISA plan, let alone an ERISA plan which is no longer operational.

7          The facts of *Roderick* are similar to those set forth here.  There, an employee held shares

8  in a stock repurchase plan with his employer.  *Roderick*, 2004 WL 2554453, at *1.  The

9  repurchase plan required that "upon termination or retirement, a shareholder must return his shares

10  at a price set by 'the most recent annual value determined . . .  for purposes of the annual valuation

11  of the Corporation's issued and outstanding Shares held and owned by the Corporation's

12  Employee Ownership Plan and Trust.'"  *Id.*  Similar to the Buy-Sell Agreement here, the *Roderick*

13  stock repurchase plan covered only select employees, provided for no employer contribution,

14  based its valuation of company stock on the same valuation used in the company's employee

15  benefit plan, and provided for a partial lump sum payment on retirement with accompanying

16  deferred payments to be paid in sixty month installments.  *Id.* at *7.  Upon retirement, the plaintiff

17  disputed the amount he was paid for his shares and claimed that, "based on his understanding of

18  [the] ESOP's holdings as well as representations allegedly made to him regarding his stock value,"

19  the price should have been higher.  *Id.* at *1.

20          The *Roderick* court held that the stock repurchase plan was not an ERISA plan and that the

21  plaintiff's claims were not preempted by ERISA.  The court concluded that "[i]t would be

22  unreasonable . . . to construe ERISA to pre-empt California law governing corporate fiduciary

23  duties in buy-sell agreements of closely held corporations . . . [; s]uch laws do not govern plans for

24  employee retirement security and thus do not fall within the scope of state law pre-empted by

25  ERISA."  *Id.* at 10.  It reached this conclusion even though the stock repurchase plan expressly

26

27  [4] *Felton v. Unisource Corp.*, 940 F.2d 503, 509-10 (9th Cir. 1991) and *Ramer v. S. California Gas. Co.*, 6 F. App'x 577, 579-80 (9th Cir. 2001) (which is, in any event, not citable, *see* Ninth Cir.

28  L.R. 36-3(c)), both similarly involved claims that the employer discharged the employee to avoid paying benefits under an ERISA plan.

incorporated the valuation used for the ESOP plan, similar to the Buy-Sell Agreement here. There was no conflict with ERISA there, and there is no conflict here.

Defendants' assertion that Plaintiff's contract claims "relate to" an ERISA plan for purposes of ERISA preemption because they require analysis and interpretation of an ERISA plan fail for the same reason as their first argument: no ERISA plan is required to resolve Plaintiff's claims. Again, the cases cited by Defendants are inapposite. The plaintiff's claims in *Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790 (1st Cir. 1995), required the court to decide what benefits the plaintiff was entitled to under an ERISA plan. *Id.* at 794. Not so here; Plaintiff's claims can be finally resolved without any ruling on the proper valuation of Plaintiff's shares under the Plan in existence at the time of his employment separation. The other cases upon which Defendants rely are similarly distinguishable. *See Hashimoto v. Bank of Hawaii*, 999 F.2d 408 (9th Cir. 1993) (holding that claim that the defendant terminated the plaintiff's employment based upon her complaints about ERISA violations was preempted because the court would be required to determine whether the employee had reasonable grounds for believing the bank had violated ERISA); *Pickett v. Bamsi, Inc.*, 1995 WL 73100 *4 (N.D. Cal. Feb. 13, 1995) (same); *Brogan v. Apple Computer*, 1996 WL 88853 *3 (N.D. Cal. Feb. 27, 1996) (holding that claim that the defendant extorted release and waiver from the plaintiff in exchange for her receipt of her bonus under an ERISA plan was preempted). Defendants have not met the burden of proving facts that demonstrate that Plaintiff's contract claims are preempted by ERISA. Their motion to dismiss on this ground must be denied.

## B.     Defendants' Other Arguments

Defendants' Reply makes only two arguments. First, that under the plain language of the Buy-Sell Agreement Plaintiff's shares were not entitled to the FY 2013 valuation, and second, that Plaintiff's remaining claims are preempted by ERISA. (Dkt. No. 19 at 2.) Both of those arguments are addressed above. Defendants' opening brief, however, made additional arguments not repeated in their Reply memorandum. (*Id.*) For the sake of completeness, the Court will briefly address them below.

United States District Court
Northern District of California

1

**1.      Contract Claims Against Defendant Bollier**

First, Defendants contend that Plaintiff's contract claims against Bollier should be dismissed because Bollier is not a party to the Buy-Sell Agreement.  Defendants claim that "[t]he Buy Sell Agreement is by its own terms a contract between [the Company], a corporate entity, and the Plaintiff.  Mr. Bollier did not sign it." (Dkt. No. 12 at 22:8-9.)  Defendant further claims that Section 5.4 of the Buy-Sell Agreement (duty of good faith and fair dealing) does not apply here because "Bollier is not being sued in his role as a stockholder or for any actions he took as stockholder under the Buy Sell Agreement." (*Id*. at 22:18-25.)  These arguments are contrary to the allegations in the complaint, the plain language of the Buy-Sell Agreement, and the law governing Buy-Sell Agreements among closely held corporations and stockholder employees.

First, Plaintiff specifically alleges that "[a]ll stockholders, including John Bollier, were subject to the terms and conditions of the Buy-Sell, including those obligations owed to other stockholders, each of whom are a party to that agreement." (Complaint ¶ 36.)  Second, the Buy Sell Agreement defines "Stockholders" as key employees of the Company and states that the general purpose of the Agreement is to provide a market for the shares held by these Stockholders, restrict ownership to only present Stockholders and active employees of the Company, and to "arrange for certain restrictions on the Transfer of the Stockholders' shares of the Stock to persons *other than the parties to [the] Agreement*." (Dkt. No. 12-2 ¶ B (emphasis added).)  Further, Paragraph 5.4 which creates the "duty of good faith and fair dealing" specifically states that:

> The Stockholders acknowledge and agree to their obligations to deal fairly and in good faith with one another.  This shall apply to all their dealings with one another as they relate to the Company and the stock, particularly in connection with the disclosure of business opportunities and disclosure in connection with the purchase and sale of the Stock hereunder.

(*Id*. at ¶ 5.4.)  Thus, the Buy-Sell Agreement by its very terms acknowledges that all stockholders are parties to the Agreement.

Finally, the California Supreme Court has adopted "[a] comprehensive rule of good faith and inherent fairness to [minority shareholders] in any transaction where control of the corporation is material . . . and declared broadly that the rule applies alike to officers, directors, and controlling

15

shareholders in the exercise of powers that are theirs by virtue of their position . . . ." *Stephenson v. Drever*, 16 Cal.4th 1167, 1178 (1997) (internal citations and quotation marks omitted).  This duty extends to officers and shareholders of closely held corporations that have entered into buy sell agreements with their employees.  *Id.* at 1179.  The Court defined a buy sell agreement as follows:

> A buy-sell agreement is a contract by which the stockholders of a closely held corporation (or a statutory "close corporation," see Corp. Code, § 158) seek to maintain control over the ownership and management of their business by restricting the transfer of its shares. The typical buy-sell agreement provides for the mandatory or optional repurchase of a stockholder's shares by the corporation or by the other stockholders upon the occurrence of a certain event; the most common of the events that can trigger the repurchase are the stockholder's death or, if he is also an employee, his retirement or the voluntary or involuntary termination of his employment. . . . The typical buy-sell agreement also specifies the method to be used to determine the repurchase price of the shares, selecting from such options as an agreed price with periodic revisions, a formula price based on book value or capitalization of earnings, or third party appraisal or arbitration. . . . Although the agreement often serves multiple purposes, its principal objective is to permit the original owners of the corporation to retain control over the identity of their business associates; a secondary purpose is to protect the investment of the departing (or the estate of the departed) shareholder by facilitating the valuation and sale of an interest that might otherwise have no ready market. . . .

*Id.* at 1173.  The Buy Sell Agreement here states the same purpose and is of the exact nature of the buy sell agreement in *Stephenson*.  Thus, Defendant Bollier may properly be held to answer for breach of the Buy Sell Agreement in his role as stockholder and officer of the Company.  Moreover, California Corporations Code Section 186 defines a shareholders' agreement as, "a written agreement among all of the shareholders of a close corporation . . . ."

### 2.    Breach of Fiduciary Duty Claim Against Defendant Bollier

Defendants argue that Bollier's fiduciary duty to the Company as a corporate officer somehow renders it impossible for him to be a fiduciary to Plaintiff as a fellow shareholder.  Defendants cite no case law in support of this argument and, in any event, it is contrary to the great weight of California authority holding that officers and controlling shareholders owe a fiduciary duty to other stockholders.  *See e.g., Stephenson*, 16 Cal.4th at 1178.  Plaintiff's fiduciary duty claim against Defendant Bollier survives.

16

1

**CONCLUSION**

2      The plain language of paragraph 2.2 of the Buy-Sell Agreement does not plausibly permit

3  the conclusion that Plaintiff's shares should have been valued using the FY 2013 appraised value;

4  accordingly, Plaintiff's claims are dismissed to the extent they are based on the assertion that the

5  FY 2013 valuation applies.  The dismissal is with leave to amend to allege claims that any shares

6  were not valued according to the FY 2012 appraised value.  In all other respects Defendants'

7  motion to dismiss is denied.  Plaintiff shall file an amended complaint within 14 days of this

8  Order.

9      This Order disposes of Docket No. 12.

10     **IT IS SO ORDERED**.

11  Dated: December 10, 2014

12  _____

13  JACQUELINE SCOTT CORLEY
United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17